MORRIS COMMUNICATIONS CORPORATION, D/B/A FAIRWAY OUTDOOR ADVER-
TISING; OUTDOOR COMMUNICATIONS, INC.; AND MAPLE COVE, INC. v. THE
CITY OF ASHEVILLE, A NORTH CAROLINA MUNICIPAL CORPORATION

No. 558PA01

(Filed 28 June 2002)

**Zoning— text amendment—off-premises signs—timeliness—
sufficiency and percentage of protest petitions**

    Defendant city improperly adopted a text amendment to a zoning ordinance regulating the size of off-premises signs for outdoor advertising without first considering the effect of protest petitions, timely filed under state law, from specific citizens affected by and opposed to the proposed zoning change, and the city is required to answer the following questions to determine the sufficiency and percentage of the protest petitions to force the city into a three-fourths favorable vote before effecting the proposed change, including: (1) determining the aggregate acreage of lots with existing nonconforming, off-premises signs within the jurisdiction; (2) totaling the aggregate acreage of those owners who properly filed protest petitions with regard to the ordinance; and (3) determining if the percentage of those who properly filed protest petitions with regard to the ordinance constitutes twenty percent or more of the aggregate acreage with existing nonconforming off-premises signs.

    On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 145 N.C. App. 597, 551 S.E.2d 508 (2001), affirming in part, reversing in part, and remanding in part an order for summary judgment entered 27 September 1999, by Caviness, J., in Superior Court, Buncombe County. Heard in the Supreme Court 11 March 2002.

MORRIS COMMUNICATIONS CORP. v. CITY OF ASHEVILLE

[356 N.C. 103 (2002)]

*Van Winkle, Buck, Wall, Starnes and Davis, P.A., by Albert L. Sneed and Craig D. Justus, for plaintiff-appellant Morris Communications, Inc.; and Long, Parker, Warren & Jones, P.A., by Robert B. Long, Jr., and Philip S. Anderson, for plaintiff-appellants Outdoor Communications, Inc., and Maple Cove, Inc.*

*Roberts & Stevens, P.A., by Sarah Patterson Brison Meldrum; Hamilton Gaskins Fay & Moon, PLLC, by Robert C. Stephens; and Robert W. Oast, Jr., City Attorney, for defendant-appellee.*

ORR, Justice.

This appeal arises from a dispute concerning a text amendment to a zoning ordinance enacted by defendant, the City of Asheville. Plaintiffs, whose general collective interest is in outdoor advertising signs that are directly affected by the amendment, argue that the City's actions were improper because the zoning change was approved without regard to applicable state legislative mandates. In particular, plaintiffs contend that the City improperly adopted the amendment at issue without first considering the effect of protest petitions, timely filed under state law, from specific citizens affected by and opposed to the proposed zoning change. We agree.

As introduction, a chronological overview of the City's off-premises sign regulations is instructive and reveals the following: In 1977, the City adopted zoning rules that regulated the use of off-premises signs—in essence, signs used for the purpose of advertising a business, product, or service that are located in a place other than the site of the business being advertised. The regulations permitted such signs in all commercial and industrial zoning districts, subject to area (square footage) and height limitations. The regulations also provided that any existing signs that exceeded the area and height limitations by more than ten percent would be considered "nonconforming." However, all existing, nonconforming signs were also "grandfathered" in by the regulations, allowing them to remain in place so long as they were not significantly altered.

The 1977 regulations stood until August of 1990, when the City enacted three relevant amendments. The substance of the changes included: (1) reducing the area and height limitations of all off-premises signs, (2) requiring that existing nonconforming signs either be brought into compliance or be removed (amortized) within five years, and (3) requiring that previously conforming

signs that were rendered nonconforming under the 1990 regulations either be brought into compliance or removed (amortized) within seven years.

In 1995, the City again amended its regulations by allowing off-premises signs that conformed with the 1977 rules to avoid amortization requirements. The City then extended the protection for such signs in May 1997, when it repealed its zoning laws and enacted in their stead chapter 7 of the Unified Development Ordinance.

Thus, in summary review, as of May 1997, all off-premises signs that were specifically rendered nonconforming by the 1990 regulations were free to remain in perpetuity, absent significant alteration.

However, just six months later, in November 1997, the City again changed its position on off-premises signs and adopted, by a 4 to 3 vote, a zoning amendment that effectively required all nonconforming, off-premises signs to be either brought into compliance with current regulations or removed by 25 November 2004. Asheville, N.C. Code of Ordinances § 7-13-8(d)(2) (Nov. 25, 1997) [hereinafter "Ordinance 2427"].

In response, plaintiffs filed suit, claiming that Ordinance 2427 had been enacted in violation of N.C.G.S. §§ 160A-385 and 160A-386, thereby making it invalid. Specifically, plaintiffs contended: (1) pursuant to the aforementioned statutes, the City was in timely receipt of the requisite petitions protesting Ordinance 2427 prior to its passage; (2) upon such timely receipt of an ample number of protest petitions opposing the ordinance, the city council was then required to reach a three-fourths favorable vote in order to pass Ordinance 2427; and (3) by failing to give effect to the ample number of timely filed protest petitions, the city council acted contrary to the mandates of the applicable statutes when it passed Ordinance 2427 by a simple majority vote. Plaintiffs moved for summary judgment on this issue, arguing that there was adequate documentary evidence showing that the city council's majority vote was invalid as a matter of law. The trial court ultimately granted the motion after concluding that plaintiffs had demonstrated that the timely filed protest petitions met the requirement to trigger the three-fourths favorable vote. On appeal, the Court of Appeals reversed on the issue, holding that the trial court had used improper criteria in calculating the legal effect of the protest petitions filed with the City. The Court of Appeals then remanded the case to the trial court with instructions to recalculate the effect of the

protest petitions using a provided formula. Because plaintiffs cannot prevail under the formula mandated by the Court of Appeals, they petitioned this Court for further review.

In their appeal to this Court, plaintiffs initially contend that the trial court correctly limited the class of lot owners included in the zoning change at issue to those immediately affected by any such change. Plaintiffs additionally argue that the Court of Appeals erred by expanding the trial court's class of lot owners to include those who might be affected if the City were to modify its zoning ordinances in the future. We agree with both contentions, and for the reasons outlined below, we expressly reverse those portions of the Court of Appeals' holding that may be construed to enlarge the class of lot owners included in the zoning change at issue beyond any lot owners who are subject to its immediate impact.

The issue we confront appears to be one of first impression in this jurisdiction, and the controlling law can be generally summarized as follows: Under state law, when lot owners comprising at least twenty percent of the area subject to a proposed zoning amendment file protests opposing the proposed change, local governments are then required to approve such amendments by no less than a three-fourths favorable vote. We note, however, that it is not the overall process as described that is in dispute. Rather, the two-part question we must address focuses narrowly on a particular step in the process, namely, how to determine *who*, under the facts of this case, constitutes those persons affected by a zoning change and *what* constitutes twenty percent of their ranks.

In the fall of 1997, the Asheville City Council made public a zoning amendment proposal concerning off-premises signs that did not conform to size restrictions. The amendment, Ordinance 2427, included a specific provision that would require all existing nonconforming signs to either come into compliance or be removed by 25 November 2004. At the time Ordinance 2427 was announced, numerous nonconforming, off-premises signs stood within the City's jurisdiction, having been "grandfathered" in under zoning changes enacted in the past.

Upon learning of the City's sunset proposal for the nonconforming signs, affected opponents of the ordinance (the "owners"—those lot owners within "the area of lots included in the proposed change") banded together in order to oppose its passage. Acting pursuant to N.C.G.S. § 160A-385, the group, including plaintiffs, submitted to the

City numerous petitions protesting the ordinance as proposed. Under the statute, if a certain percentage of affected property owners file protests against a proposed change, a three-fourths favorable vote by the city council is required to effect such change. Plaintiffs contend that the petitions filed represent a sufficient percentage to force a three-fourths vote. In order to assess their contention, we turn to the specific language of the statute, which reads as follows:

> Zoning regulations and restrictions and zone boundaries may from time to time be amended, supplemented, changed, modified or repealed. In case, however, of a protest against such change, · signed by the owners of twenty percent (20%) or more . . . of the area of lots included in a proposed change, . . . an amendment shall not become effective except by the favorable vote of three-fourths of all the members of the city council.

N.C.G.S. § 160A-385(a) (1999). Thus, under the statutory provisions, we must ultimately determine whether the protest petitions filed with regard to Ordinance 2427 represent "owners of twenty percent (20%) or more . . . of the area of lots included in the proposed change."[1]

I.

In order to calculate a percentage of a particular group, we must first determine who comprises the group itself. Here, the statute defines the group as "owners . . . of the area of lots included in the proposed change." The group, therefore, consists of persons or entities who own lots within the areas subject to the proposed change's effects.

A careful reading of Ordinance 2427 reveals that the only immediate and actual effect of the proposed change at issue would be the elimination of existing, previously "grandfathered" signs that are also both nonconforming and off-premises. Thus, we preliminarily conclude that only lot owners who had existing signs subject to the proposal qualify as members of the group. A further inquiry as to what other lot owners might qualify for the group reveals there are none. Lot owners within the City's jurisdiction who have existing off-premises signs that comply with zoning rules fail to qualify for the

---

1. We observe that the subject matter at issue here, i.e., nonconforming signs, does not readily lend itself to the general applicability of this statute, wherein the area of the *lots* affected is a determinative factor. The area of the lots "included in a proposed change" has little, if anything, to do with a nonconforming sign, which could as easily sit on a tiny strip of land as on a five-acre lot.

group because their signs conform, rendering their respective lots unaffected by the proposed change. Likewise, lot owners within the City's jurisdiction who are eligible to erect off-premises signs but who have not yet done so fail to qualify for the group because they have no existing signs at all, and thus their lots are also not "included in the proposed change."[2] Lastly, we consider whether all lot owners within areas zoned for off-premises signs should be made eligible for the group because *unknown future actions* by the city council *may* render their once-conforming signs nonconforming. In our view, the prospect for an unspecified zoning change at some time in the future has no bearing on the circumstances here. At issue is an ordinance that, if enacted, triggers an immediate effect, namely, the required amortization of existing, off-premises signs that are nonconforming. It has no effect whatsoever on any signs that *may* be erected and subsequently become nonconforming due to future changes in the ordinance.

In *Godfrey v. Zoning Bd. of Adjust. of Union Cty.*, 317 N.C. 51, 344 S.E.2d 272 (1986), this Court concluded that a structure not in existence on the effective date of a zoning amendment does not constitute a nonconforming use, and adopted the view of the Pennsylvania Supreme Court, which said that "[b]efore a supposed nonconforming use may be protected, it must exist somewhere outside the property owner's mind." *Id.* at 57, 344 S.E.2d at 276 (quoting *Cook v. Bensalem Township Bd. of Adjustment*, 413 Pa. 175, 179, 196 A.2d 327, 330 (1963). Likewise, before a supposed nonconforming use may be eliminated, it must exist somewhere outside the zoning authority's mind. Therefore, property owners who can merely contend that their lots *may* be similarly affected in the future have no lots that are "included in the proposed change" at hand. As a result, such lot owners cannot be included in the group. To hold otherwise would require that a protest petition grouping consist of all lot owners within a zoning jurisdiction since, at any later time, a similar change affecting them *could* take place. Such an interpretation is obviously not what the General Assembly intended when it enacted

2. We note, too, that lot owners located in areas permitting off-premises signs who either (1) have no off-premises signs, or (2) have only signs that conform to zoning rules cannot claim to be group eligible by virtue of a "grandfathered" right to erect nonconforming signs in the future. No lot owner possesses such a right under the city code. Past "grandfathering" pertained exclusively to existing signs that were both off-premises and nonconforming. Moreover, no provision of the code allows lot owners to erect off-premises signs that do not conform. Thus, with no option to erect nonconforming signs, such owners are without lots "included in the proposed change."

the protest petition statutes, which specifically refer to lot owners "included in the proposed change" at issue.

A review of our tally shows then that for purposes of the statute, the group of lot owners included in the proposed change is limited to those select lot owners who had existing, *nonconforming*, off-premises signs *at the time* Ordinance 2427 was announced.

We recognize that determining the number of lot owners included in a proposed zoning change will not always necessitate such a detailed accounting of eligible protest petitioners. Simply put, the relevant portion of Ordinance 2427 deals directly with the amortization of in-place, off-premises signs that do not conform to size requirements. The only signs affected by the ordinance's reach are those that have been previously "grandfathered" in by the City's zoning authority. As a result, only those lot owners who have such signs can be considered as "included in [the] proposed change." Thus, in sum, we emphasize that this is less a complex case commanding resolution through narrow statutory constructs than it is a case of narrow circumstance.

Having determined then the formula for calculating those lot owners included in the proposed zoning change, we next turn to applying it to the appropriate owners in the instant case. However, from the outset, we note that a careful reading of the record renders this Court unable to do so based upon the evidence in the record. Most importantly, we are unable to ascertain from the record precisely which lot owners are involved in the proposed change, an omission that prevents us from calculating the requisite twenty percent of their number. At various points, the record reflects that there are seventy-eight existing signs that will be affected by the proposed change delineated in the ordinance at issue. However, the number of signs is of little practical use since the formula for calculating affected "grandfathered" owners is based on the acreage of their respective lots, not on the number of signs. As for determining the total acreage of lots "included in the proposed change," the numbers proffered by the parties and used by the Court of Appeals provide no assistance. Each of the parties and the Court of Appeals seem to agree that at the time of the proposed ordinance there were 4,928 acres zoned to permit "off-premises" signs within the jurisdiction.[3] All

3. In its decision, the Court of Appeals held that the 4,928-acre area zoned to permit off-premises signs also served as the total "area of lots included in the proposed change." The City, on appeal to this Court, concurs with the Court of Appeals

equally concur that, at the same time, there were 243.89 acres of lots on which such "off-premises" signs actually stood. However, neither figure is adequate for purposes of determining which lots were included in the proposed change because the figure needed must be drawn from those lots supporting existing "off-premises" signs *that are also nonconforming*, the only group of signs immediately affected by the relevant portions of Ordinance 2427.

Even the trial court was not immune from adding to the confusion. In its order granting partial summary judgment in favor of plaintiffs, the trial court described the area included in the proposed change as "the lots upon which off-premises signs affected by the seven (7) year amortization provisions of Ordinance 2427 were located at the time of its passage." While we recognize that the trial court's description of the areas impacted by the ordinance ostensibly encompasses the thrust of this Court's parameters, we also note that the order is silent as to a tally of the acreage of lots so qualified. Thus, despite the efforts of all involved, we are still left without the numbers necessary to apply the required formula. As a result, in order to proceed with the reenactment of the ordinance, the City would have to make the following preliminary calculations: (1) determine, first, the aggregate acreage of lots with existing nonconforming, off-premises signs within the jurisdiction; (2) total the aggregate acreage of those owners who properly filed protest petitions with regard to the ordinance;[4] and (3) determine if the percentage of those who properly filed protest petitions with regard to the ordinance constitutes twenty percent or more of the aggregate acreage with existing nonconforming, off-premises signs (as calculated in number (1), above).

The answers to the three calculations can then collectively serve to provide the City with the information it needs in order to proceed with its enactment of the proposed ordinance, namely whether: (1) plaintiffs have satisfied the requirements of the protest petition statute, and (2) the city council is required to reach a three-fourths vote in order to enact the proposed ordinance.

---

holding and urges us to adopt the 4,928-acre zone as the basis for our calculations. We decline to do so, however, for the reasons cited in the remainder of part I of this opinion.

4. The guidelines for determining the accuracy, sufficiency and timeliness of protest petitions is detailed in part II of this opinion, *supra*.

## II.

We next examine the issue of whether the City failed to carry out its "affirmative duty to determine the sufficiency, timeliness, and percentage of the protest [petitions] and to call forthe vote that the law required." *Unruh v. City of Asheville*, 97 N.C. App. 287, 290, 388 S.E.2d. 235, 237, *disc. rev. denied*, 326 N.C. 487, 391 S.E.2d 813 (1990). In essence, *Unruh* spells out a zoning authority's responsibilities for any petitions that may be filed in opposition to a proposed zoning change. Upon receipt of such petitions, a zoning authority, or its agents, is obliged to log them, to determine whether they were timely filed, and to make calculations aimed at determining whether the number of petitions received constitute an adequate protest group. *See generally id.*; *see also* N.C.G.S. § 160A-385(a).

In the case *sub judice*, the trial court concluded that there were lingering disputes as to "whether or not the City of Asheville carried out its duties under the protest petition law as mandated by *Unruh*." As a consequence of so finding, the trial court ordered that such disputes must be resolved at trial, and further ordered that evidence or argument "as to the validity of the protest petitions" could not be foreclosed. Upon review of the trial court's order, the Court of Appeals unanimously concluded that "we cannot hold as a matter of law that the City failed to meet its affirmative duties under *Unruh*." *Morris Communications Corp. v. City of Asheville*, 145 N.C. App. 597, 608, 551 S.E.2d 508, 516 (2001). Thus, to this point, the issue of whether the City met its *Unruh* obligations has yet to be decided.

We note from the outset that the question of whether or not the City has satisfied its affirmative duties under *Unruh* is a corollary of the primary issue in this case: Were the protest petitions filed sufficient to force the City into a three-fourths favorable vote in order to effect the proposed zoning change? We also note that the proper application of the formula outlined in part I, *supra*, will simultaneously provide the evidence needed to show whether a zoning authority has indeed met its *Unruh* obligations, which are to determine (1) the sufficiency, (2) the timeliness, and (3) the percentage of the protest petitions on file. *Unruh*, 97 N.C. App. at 290, 388 S.E.2d. at 237.

Once the City calculates the total acreage of those affected by the proposed change, using the formula as outlined in part I, *supra*, it must next determine if the protest petitions on file constitute the necessary twenty percent minimum of that total acreage. Thus, for pur-

poses of *Unruh,* the *"percentage* of the protest petitions" will then be determined, which in turn allows for a calculation as to whether that percentage is quantitatively *sufficient* to warrant a three-fourths vote in order to enact the zoning change. Moreover, the process of imposing the formula as described in part I, *supra,* simultaneously forces the City to assess "the accuracy of the petitions"—thereby fulfilling the *Unruh* requirement that all protest petitions prove qualitatively *sufficient*—by weeding out any petitions from persons who do not qualify under the protester criteria. *See id.* (holding that it is the zoning authority's statutory duty to conduct such petition evaluations); *see also* N.C.G.S. § 160A-385 (providing that qualifying protesters are expressly limited to those persons "included in the proposed change"); *and* part I of this opinion, *supra* (describing, for the purposes of this case, the process of how persons may be qualified as being "included in the proposed change" under Ordinance 2427). In general, such evaluations for qualitative *sufficiency* will also include assessing the *timeliness* of protest petitions received, but it was not necessary to conduct such an inquiry in the instant case because both parties conceded that the petitions on record ·were received by the City in timely fashion.

With regard to the petitions at issue, the City has heretofore satisfied only the *timeliness* prong of the *Unruh* inquiry. The formula for determining their accuracy, as supplied in part I, *supra,* has never even been applied to the petitions at issue. As a result, the City has failed to meet its affirmative duty to determine either the *sufficiency* or *percentage* of the protest petitions submitted, an abrogation that necessarily "render[s] the [enacted] ordinance invalid on its face." *See Unruh,* 97 N.C. App. at 290, 388 S.E.2d at 237 (concluding that the protest petition statute plainly provides that a comprehensive review of protest petitions shall include an assessment of their "timeliness," "sufficiency," and "percentage," and holding that a zoning entity's failure to conduct such inquiry into submitted protest petitions invalidates the ordinance as enacted). Thus, because the City here conducted both an incomplete and inaccurate review of the submitted petitions protesting the ordinance at issue, we reverse the Court of Appeals and hold that any and all portions of Ordinance 2427 that impose compliance deadlines on existing nonconforming, off-premises signs are invalid as enacted by a 4 to 3 vote of the city council.

REVERSED.